## UNITED STATES v. ANDERS.
### No. 8202.

Circuit Court of Appeals, Ninth Circuit.
March 8, 1937.

**510**

John B. Tansil, U. S. Atty., of Butte, Mont., Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to Atty. Gen., and W. Clifton Stone, Atty., Dept. of Justice, of Washington, D. C., for the United States.

John W. Mahan, of Helena, Mont., for appellee.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

Henry Anders, the appellee, enlisted in the United States Army April 15, 1917, and saw service in France. Shortly after enlistment he applied for and was granted war risk insurance in the sum of $10,000, and paid premiums thereon to keep the insurance in force until May, 1919. He suffered a foot injury in October, 1918, at Survinne, France. An infection set in and he was hospitalized for approximately six weeks. He did not rejoin his company after release from the hospital, but shortly thereafter he was returned to the United States and received his honorable discharge from the Army at Missoula, Mont., February, 1919. He married in the same month, and lived on a ranch for the next two years. He left the ranch and worked at manual labor for about one year. During this time he suffered from rheumatism of the joints and heart attacks, noticing the first of the latter three or four weeks after his discharge from the Army. In 1922 he quit work as a laborer and took up "vocational training" at Missoula, for about three years; then he went to a veterans' hospital for two months. A short time thereafter he secured work as a janitor for the Veterans' Bureau, in Helena, Mont., which lasted for a year and a half. While thus employed he was under the care of the Bureau doctors. He was again in a hospital for three or four weeks in 1927, suffering from rheumatism and, while there, he was notified that his position of janitor had been filled by another. After leaving the hospital he returned to Helena, where his rheumatism continued to "bother" him. During this time he also had heart attacks. Since 1927 he worked intermittently for a Mr. C. A. Rost, in the automobile top, body, and upholstering business.

On April 6, 1927, he applied for reinstatement of the $10,000 term insurance which he had allowed to lapse in May, 1919.

He stated in the application that his health was practically the same as when he allowed his insurance to lapse; that he was prevented from carrying on his usual occupation and he had consulted physicians since lapse of his policy; that the cause was "rheumatism and heart"; that he had made application for compensation and training allowance because of the same trouble; and that he wished to have the reinstatement become effective as of the first day in the month in which the requirements had been complied with.

The medical examiner's report made on the same day found myocarditis; a first aortic accentuated murmur; Ch. bronchitis; rheumatism; impaired ability to work because of rheumatism and heart; and that Anders was a "fair risk." The special report of heart and blood vessels stated that the first aortic accentuated murmur was transmitted by the great vessels; that it was organic; that it was probably caused by rheumatism; that there was an enlargement which was probably caused by myocarditis; that it was severe; that the condition of the arteries was good; and, to the question, "If Bradycardia or tachycardia exists give cause," the examiner answered, "Rheumatism."

Anders' application for reinstatement was accepted by the Bureau of War Risk Insurance with the notation: "Acceptable only under 333 Sec. 304 Apr 19 1927. Insurance Medical Section. A. J. McIntyre." The reissued insurance became effective May 1, 1927. We set out section 304 (44 Stat. 799 [see 38 U.S.C.A. § 515]) in part: "In the event that all provisions of the rules and regulations other than the requirements as to the physical condition of the applicant for insurance have been complied with an application for reinstatement, in whole or in part, of lapsed or canceled yearly renewable term insurance * * * hereafter made may be approved if made within one year after the passage of this amendatory Act or within two years after the date of lapse or cancellation: Provided, That the applicant's disability is the result of an injury or disease, or of an aggravation thereof, suffered or contracted in the active military or naval service during the World War: Provided further, That the applicant during his lifetime submits proof satisfactory to the director showing that he is not totally and permanently disabled."

Anders collapsed in the street in Helena, Mont., on June 25, 1927, and was carried

into the office of Dr. Berg, who testified as a witness for the plaintiff.

On November 10, 1927, the appellee wrote the Veterans' Bureau claiming to have been totally and permanently disabled from February 3, 1919, the date of his discharge from the service, and demanding payment of his insurance from that date, although he did not follow this claim through.

The next demand by Anders was for the benefits of his reinstated insurance, made on or about March 31, 1932. On July 13, 1932, the Director of the Veterans' Administration wrote Anders refusing to grant the said benefits and denying the claim.

Anders brought suit on the policy, the case was tried to a court and jury, verdict was for plaintiff, and defendant appeals. The jury found Anders to be totally and permanently disabled from June 25, 1927, and judgment was entered accordingly.

The Government called no witnesses, presented no evidence.

In his application for reinstatement the appellee answered, "Yes," to the question: "Are you now permanently and totally disabled?" On cross-examination, when questioned about this, he said that he did not write in the answer, but that he did sign the paper; that what appeared on the paper must have been true; that he may not have understood what he said; that, "If there is any fault there, I did not intend it"; that he did consider himself permanently and totally disabled; that it was his own conclusion in the matter at the time.

Dr. Berg testified that his examination of Anders made on June 25, 1927, disclosed auricular fibrillation, which was not present when he examined him on March 12, 1926; that he had no indications whatever of this trouble at the earlier date; that he had seen Anders three or four times since June 25, 1927, and that his condition was markedly worse on these latter occasions than at the time of his first examination in 1926; there has been a progressive myocardial involvement; that he had advised rest and no work for Anders since June, 1927.

A Dr. Thompson testified that he first examined the plaintiff in June, 1929, twice in April, 1932, and once again in February, 1936; that he found chronic myocarditis, at first moderate, but more severe at each examination; that it was very severe; that he advised absolute rest and no work, in-definitely, for the balance of his life; that he was incurable.

Doctors Briscoe and Jameson, each of whom testified, examined the plaintiff in 1932, and found myocardial weakness or insufficiency. They also testified as having treated Anders during attacks of paroxysmal tachycardia. Dr. Briscoe went on to state that the prognosis of the case was unfavorable; that exertion or physical activity was liable to bring about an attack.

Dr. William Fortin, who examined the plaintiff on December 26, 1926, testified that he diagnosed the plaintiff's trouble at that time as auricular fibrillation, severe; and myocarditis, chronic.

Dr. James M. Flyn, a witness for the plaintiff, testified that he had examined Anders first in 1925, and at the latest, a day or two before the trial. He stated that plaintiff was suffering from substantially the same ailments as were testified to by the other physicians, but, significantly, he said: "There has been no change in his condition since when I first examined him."

Anders' wife and his last employer, C. A. Rost, also appeared as witnesses for the plaintiff. Mrs. Anders said that her husband's condition was worse at the time of trial than before the coming to Helena; that he had more heart attacks; that when he works he is tired and nervous and heart attacks come on; and that "when he is not working, he is pretty good, gets around pretty good." Mr. Rost testified that Anders began working for him in June, 1927; that he had not worked steadily, but only at intervals; that during 1928, 1929, and 1930 he worked nearly half of the time, from 10 to 13 days a month; that the witness had seen Anders suffer from attacks while on the job; that he would have to sit down to rest or go home.

The appellant specifies as error the refusal of the court to grant its request for a directed verdict. The only question before us is: "Whether there is any substantial evidence that plaintiff became totally permanently disabled on June 25, 1927, thirty-three days after the issuance of the insurance policy sued upon."

Counsel for the appellant argue that the insurance is against total permanent disability occurring during the life of the policy, and that it is not a contract of indemnity for a pre-existing total permanent disability, and that evidence consistent with

an hypothesis that total permanent disability antedated the issuance of insurance or occurred after the expiration of insurance will not support a judgment for the plaintiff.

It is true, as the appellant contends, that the insurance is against total permanent disability occurring during the life of the policy and is not a contract of indemnity for a pre-existing total permanent disability. See United States v. McIver (C.C.A. 4) 77 F.(2d) 208, 209; United States v. Mathis (C.C.A.10) 84 F.(2d) 451; Hicks v. U.S. (C.C.A.4) 65 F.(2d) 517, 521; United States v. Kaminsky (C.C.A.5) 64 F.(2d) 735, 737. See, also, Jordan v. U. S. (C.C. A.9) 36 F.(2d) 43, 44, 73 A.L.R. 312, where it is said: " * * * what is provided for is a contract of insurance against something that may happen and not of indemnity for something which has already happened."

■ Here, however, the appellee submitted to a physical examination at the time of making his application for reinstatement of his policy, and was classed as a fair risk by the examining physician, and thereafter he was accepted by the Bureau of War Risk Insurance. The examining doctor must have found the insured not totally permanently disabled, otherwise he would not have classed him as a fair risk.

The only witness who testified positively that the plaintiff's condition was not worse since 1927 was Dr. Flyn, and he said that he had "made him quit work numerous times, told him he would have to slow up, and not exert himself"; and that he knew that Anders' attempts to do things had brought on those attacks.

It cannot be seriously argued that the plaintiff at the time of trial was not totally and permanently disabled. The issue to be determined is: When, in the light of the testimony in the record, did the plaintiff become so disabled? If he became totally permanently disabled before May 1, 1927, then the Government must prevail; if there is substantial evidence from which the jury could conclude that he became so disabled after that date and after his policy was reinstated, the judgment must be affirmed. The jury found his total and permanent disability began on June 25, 1927, the day on which, it will be remembered, the plaintiff collapsed on the sidewalk in front of Dr. Berg's office.

Notwithstanding Dr. Flyn's testimony that the condition of Anders had not changed from the time he first examined him in 1925, and his last examination just before the trial, we have the persuasive fact of Anders being accepted as a fair risk and his policy reinstated in April, 1927. There is also Dr. Berg's testimony that the plaintiff was markedly worse June 25, 1927, than he was March 12, 1926. This evidence is substantial, and to the point; and together with the testimony of the other witnesses furnished substantial evidence upon which the jury could find a verdict for the plaintiff.

Judgment affirmed.